UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN GARBER,

      Plaintiff,

                                Hon. Phillip J. Green

v.

                                Case No. 1:16-cv-00455-PJG

MITCHELL DEISCH, et al.,

      Defendants,

_____/

## **OPINION**

Plaintiff John Garber filed this lawsuit claiming that the defendants conspired to have him wrongfully prosecuted for embezzlement, resulting in his early retirement as the City of Manistee's Director of Public Works and his election loss in the city council election. His complaint raises three federal claims: conspiracy to deprive him of his "free expression" right to run for public office, contrary to 42 U.S.C. § 1985 (Count I); violation of his First Amendment right to be a candidate for public office (Count II), contrary to 42 U.S.C. § 1983; and violation of his Fourth Amendment rights by conspiring to instigate an investigation and prosecution for embezzlement that lacked probable cause, contrary to 42 U.S.C. § 1983 (Count III). Plaintiff also brings four supplemental state claims: civil conspiracy to have him wrongfully arrested and to prevent his election to public office (Count IV); malicious prosecution (Count V); abuse of process (Count VI); and intentional infliction of emotional distress (Count VII).

Defendants City of Manistee, City Manager Mitchell Deisch, Public Safety Director (Police Chief) David Bachman, Finance Director (City Treasurer) Edward Bradford, and Utilities Director Jeffrey Mikula (collectively "City Defendants") have moved for summary judgment on all claims. (ECF No. 42). Plaintiff has responded (ECF No. 57), and City Defendants have replied. (ECF No. 60).

Defendant Paul R. Spaniola, the elected Mason County Prosecutor, separately seeks summary judgment as to the counts against him. (ECF No. 46). Plaintiff has responded (ECF No. 58), and Defendant Spaniola has replied (ECF No. 59).

Plaintiff has moved to amend his complaint "to clarify the issues associated with Defendant Spaniola's involvement in this litigation." (ECF No. 35, PageID.261). For purposes of the pending motions for summary judgment, the Court is considering all the allegations in the proposed amended complaint. (*See* Proposed First Amended Complaint, ECF No. 35, PageID.263-86).

The Court conducted oral argument on all the motions. (ECF No. 69). For the reasons stated herein, each of the motions for summary judgment (ECF No. 42, 46) will be granted. As the Court has determined that nothing in the proposed amended complaint would alter the outcome here, plaintiff's motion to amend the complaint (ECF No. 35) will be denied as futile.

## **Factual Findings**

The following facts are beyond genuine issue.

Plaintiff worked for the City of Manistee, Michigan, as a full-time employee from 1971 to his retirement on April 1, 2013. At the time of his retirement, plaintiff

was the Director of the Department of Public Works. That department collected abandoned scrap metal from around the city and sold it to a scrap metal company.[1] Plaintiff's retirement was prompted by allegations that he had embezzled the city's scrap metal proceeds, and assertions that he risked losing his pension. (Garber Dep. at 15, 28-34, ECF No. 47-2, PageID.913, 916-18).

1.   The Criminal Investigation

In February 2013, the City of Manistee hired Jeffrey Mikula as Utilities Director. Mr. Mikula was interested in using the sale of the City's scrap metal as a source of funding. While looking into that matter, he learned of the existence of a check from the Padnos Scrap Metal Company made payable to plaintiff, which was in the DPW safe. The check was dated February 26, 2013, in the amount of $901.60. Mr. Mikula told City Treasurer Edward Bradford, of the discovery of the check. (Miller Report at 4-5, 35; ECF No. 43-2; PageID.381-82, 412).[2]

Immediately after receiving this information, Mr. Bradford asked plaintiff to bring the check to the treasurer's office so that it could be deposited into the city's

---

[1] Plaintiff is advised that the purported verification at the end of his complaint (ECF No. 1, PageID.21), and at the end of his proposed amended complaint (ECF No. 35, PageID.286), are being disregarded for the purposes of this decision. " '[S]tatements made on belief or on "information and belief," cannot be utilized on a summary-judgment motion.' " *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (quoting 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738, at 345 (3d ed. 1998)).

[2] At the motion hearing, plaintiff's counsel conceded the accuracy of the information in the report of Michigan State Police Detective Sergeant Mark Miller, and that the Court may rely on the information in the report for purposes of defendants' summary judgment motions. The report will be referred to herein simply as the "Miller Report," which is found in the record at ECF No. 43-2.

bank account. Mr. Bradford then began a review of the city's financial records to determine whether there had been any misuse of the scrap metal funds. He obtained records from Padnos relating to the city's sales of scrap metal dating back to 2006. (*Id.* at 5, PageID.382).

These records indicated that Padnos did not follow a uniform procedure for issuing payment for the city's scrap metal. In some instances, the company issued checks payable to the "City of Manistee"; in other instances, it issued checks payable to "John Robert Garber," "Jack Garber," and "Ed Cote."[3] (*Id.*). Mr. Bradford compared the Padnos checks against the record of deposits. He discovered that two of the checks made payable to "John Robert Garber" in July 2012 had never been received by his office, nor had they been deposited into the city's bank account. (*Id.*). One of the checks was dated July 20, 2012, and the other July 23, 2012. Both checks included plaintiff's home address. The checks totaled $2,129.46. (*Id.* at 7, PageID.384). They were both endorsed by plaintiff and deposited into his personal account at the Filer Credit Union. (*Id.* at 33, PageID.410). The City of Manistee did not have an account at that credit union. (*Id.* at 5, PageID.382).

On March 27, 2013, Mr. Bradford informed City Manager Deisch of the two checks in question.[4] Mr. Bradford advised Mr. Deisch that there was no record that the funds from these checks had ever been deposited into the city bank account.

---

[3] Mr. Cote worked as the City of Manistee's Utility Director. He is retired.
[4] Mr. Deisch had first been made aware of the potential conversion of funds during a breakfast meeting on March 22, 2013. (Miller Report at 6, PageID.383).

4

(Miller Report at 7, PageID.384). Also on that day, Manistee City Police Department Detective John Riley contacted Michigan State Police Detective Mark Miller, and informed him of a potential complaint involving embezzlement of city funds. Detective Riley asked that, due to the police department's potential conflict of interest, the Michigan State Police assume responsibility for conducting the criminal investigation. (*Id.* at 4, PageID.381).

In the morning of the next day, March 28, Police Chief David Bachman advised plaintiff of the concerns that plaintiff was converting the city's scrap metal proceeds to his personal use. Plaintiff denied having ever personally endorsed a Padnos check, and he stated that he would have turned over all such checks to the City Treasurer's Office. City Manager Deisch placed plaintiff on paid administrative leave pending an investigation into the matter. (*Id.* at 9, PageID.386).

Later that same day, Detective Miller met with the following city officials: Police Chief Bachman, Detective Riley, City Treasurer Bradford, and Utilities Director Mikula. Detective Miller was given information and documents that had already been obtained from Padnos and the city's finance department. Detective Miller delayed the beginning of his investigation pending the city's receipt of copies of the cancelled checks in question. He began his investigation on April 1, 2013. (Miller Report at 4-5, PageID.381-82).

In the meantime, on Easter Sunday, March 31, 2013, Police Chief Bachman went to plaintiff's residence, at plaintiff's request. Plaintiff provided Chief Bachman a sealed envelope addressed to the chief. Plaintiff advised the chief that the envelope

contained a letter concerning the scrap metal issue. Plaintiff also mentioned something about the Department of Public Works and the Sewer and Water Departments always having "slush funds" on hand. Chief Bachman did not open the envelope, but rather, took it to City Manager Deisch's home, and left it with him. Mr. Deisch did not open the envelope until the next morning. (*Id.* at 9, PageID.386). The envelope contained a one-page letter, dated March 29, 2013, in which plaintiff explained the past practice for the use of the city's scrap metal proceeds.[5] In the letter, plaintiff denied ever converting city funds to his own use, asserting that the scrap metal proceeds were used for "retirements, cookouts, Christmas Parties and buying some tools."[6] (*Id.* at 11, PageID.388). Mr. Deisch returned the letter to Chief Bachman the same day. (*Id.* at 9, PageID.386). The letter was later turned over to Detective Miller. (*Id.* at 11, PageID.388).

On April 1, 2013, plaintiff contacted City Manager Deisch, and plaintiff submitted an official request to be placed on retirement status. Mr. Deisch granted that request. (Miller Report at 7, PageID.384). The next day, Mr. Deisch issued a press release announcing plaintiff's retirement in which he noted: "I can confirm after being asked by the media that an investigation has been initiated by the Michigan State Police concerning activities of Mr. Garber in his official duties as a

---

[5] The contents of the letter are found in the Miller Report at 11, ECF No. 43-2, PageID.388.

[6] According to Police Chief Bachman, plaintiff had previously claimed that he paid for the Christmas parties with his own money. (Miller Report at 44, ECF No. 43-2, PageID.421).

City employee. No further comments will be made until the official investigation is completed by the Michigan State Police." (ECF No. 57-10, PageID.1606).

Detective Miller interviewed Mr. Deisch on April 2. Among other things, Mr. Deisch advised the detective that, when he began his tenure as City Manager in 2001, there had been a practice in place in which the city's scrap metal proceeds were used to pay for employee picnics and Christmas parties. This included the purchase of alcohol. Mr. Deisch put a stop to the purchase of alcohol with city funds, but the use of city funds to otherwise pay for these social events continued. To his knowledge, no employee was ever given permission to use city funds for personal use. (Miller Report at 6-8, ECF No. 43-2, PageID.383-85).

City Treasurer Bradford also advised Detective Miller that no employee had been given authorization to use city funds for personal use. Mr. Bradford explained that the issue of the use of the city's scrap metal proceeds had been discussed during a meeting in the previous few years, and that he had informed plaintiff of the requirement that any such funds be deposited into the city's bank account. (*Id.* at 8, PageID.385).

Detective Miller interviewed a number of city employees and former employees. Many of these individuals indicated either that the city did not have a formal policy regarding the handling of the city's scrap metal, or that they had no knowledge of such a policy. (Miller Report at 12-31, PageID.389-408). Edward Cote, a retired supervisor of the City Water Department, and then member of the Manistee City Council, advised the detective that the city's scrap metal proceeds had previously

been used for Christmas and retirement parties, and that he had once obtained permission from City Manager Deisch and City Treasurer Bradford to purchase a refrigerator and other items for the Waste Water Treatment Plant. Detective Miller obtained records indicating that a couple of Padnos checks were made payable to Mr. Cote, which were deposited into the city's bank account. (*Id.* at 22-23, PageID.399-400). The detective obtained from Mr. Bradford a copy of a letter, dated June 18, 2007, documenting Mr. Cote's request to use scrap metal proceeds to purchase the refrigerator and other items for the Waste Water Treatment Plant. (*Id.* at 22, PageID.399).

During his investigation, Detective Miller obtained records from Padnos concerning the City of Manistee's sale of scrap metal. These records showed fifteen scrap metal sales involving plaintiff between November 29, 2006, and July 23, 2012. In twelve of these transactions, checks were issued payable to plaintiff; in the three others, plaintiff was paid in cash. All twelve checks were endorsed by plaintiff and either deposited into his account or cashed at the Filer Credit Union. The records also reflected two Padnos checks made payable to another Department of Public Works employee, which were endorsed by plaintiff and deposited into his personal account at the Filer Credit Union. The funds involved in the seventeen transactions totaled $9,357.83. City Treasurer Bradford advised Detective Miller that he had no information or documentation that any of these funds were ever deposited into the city's bank account or turned over to the City Treasurer's Office. (Miller Report at 32-34, PageID.409-11).

The Padnos records also included eight transactions involving the sale of the City of Manistee scrap metal from August 16, 2006, and December 4, 2012, by employees other than plaintiff. The total proceeds of these transactions was $10,883.49. Records reflect that the proceeds from each of these eight transactions were deposited into the city's bank account. (*Id.* at 34, PageID.411).

On April 29, 2013, Manistee County Chief Assistant Prosecutor Jason Haag reviewed and approved an affidavit and search warrant for records relating to plaintiff's account at the Filer Credit Union. (*Id.* at 36, PageID.413). April 30, 2013, 85th District Judge Brunner authorized a search warrant based on the affidavit approved by Mr. Haag. (*Id.*). The credit union provided records dating back to May 2007 (prior records had already been purged), which reflected eight transactions in which plaintiff deposited Padnos checks into his personal account and then made an immediate cash withdrawal in the same amount. There were no credit union records found relating to cash payments Padnos made to plaintiff. (*Id.* at 38, PageID.415).

Detective Miller contacted plaintiff's then-attorney, Mark Quinn, on August 19, 2013, requesting an interview with plaintiff. Mr. Quinn stated that he would discuss the request with plaintiff and advise the detective of plaintiff's response the following week. Detective Miller did not hear back from Mr. Quinn. (Miller Report at 38, PageID.415).

On August 29, 2013, Detective Miller submitted a complaint against plaintiff to the Manistee County Prosecuting Attorney. The county prosecutor, citing a conflict of interest, asked the Michigan Attorney General's Office to assign the case to another

prosecutor. Detective Miller was informed on October 8, 2013, that plaintiff's case had been assigned to Mason County Prosecutor Paul Spaniola. (*Id.* at 39, PageID.416).

On October 11, 2013, Prosecutor Spaniola asked Detective Miller to conduct three additional interviews: former Manistee City Manager Ben Bifoss, former Manistee Director of Department of Public Works Dale Picardat, and former Manistee City Treasurer Ken Oleniczak.[7] (*Id.*). Plaintiff had identified these three individuals in his March 29, 2013, letter to Police Chief Bachman as individuals who could support his explanation for the handling of scrap metal sales and the use of the sales' proceeds. (*See id.* at 11, 39; PageID.388, 416).

Mr. Bifoss advised Detective Miller that he did not recall the specifics of how the City of Manistee handled scrap metal sales or the proceeds of those sales, but he stated: "[C]learly, any proceeds coming into the City from any source would need to go directly to the City." Mr. Bifoss acknowledged that some of the scrap metal proceeds could have been used for employee parties or picnics. (Miller Report at 40, ECF No. 43-2, PageID.417).

Mr. Picardat stated that he was unaware of any scrap metal proceeds being used to fund employee parties or picnics, or to purchase tools. He denied the existence

---

[7] In his deposition, Prosecutor Spaniola testified that he asked Detective Miller to conduct these interviews because he wanted clarification regarding whether plaintiff had a tacit understanding with the previous city manager (Mr. Bifoss) to handle the scrap metal proceeds the way he did. (Spaniola Dep. at 9-10, ECF No. 47-1, PageID.889-90).

of any "slush fund." Mr. Picardat advised that, while he had not been specifically told to submit all sales proceeds to city hall, he knew to do that, describing it as an ethical issue. (*Id.*).

Mr. Oleniczak told Detective Miller that, during his time with the city, scrap metal was sold to a local scrap dealer, and that the dealer made the payments directly to the city. He advised that, to the best of his knowledge, no city money was used to fund parties or picnics. (*Id.* at 41, PageID.418).

2. The Prosecution

On October 29, 2013, Prosecutor Spaniola obtained a misdemeanor warrant against plaintiff on the charge of embezzlement – agent or trustee, at least $200 but less than $1,000, MICH. COMP. LAWS § 750.174(3). (Miller Report at 42, ECF No. 43-2, PageID.419). Mr. Spaniola made the probable cause decision himself, without consulting anyone else. (Spaniola Dep. at 16-17, ECF No. 47-1, PageID.891). He testified that the Prosecuting Attorney for Manistee County had led him to believe "that [plaintiff] having no prior record would be amenable to a quick disposition on a misdemeanor basis." (*Id.* at 13, PageID.890).

On November 1, 2013, plaintiff was arraigned on the misdemeanor embezzlement charge. Later that day, Mr. Spaniola issued a press release, announcing the misdemeanor charge against plaintiff.[8] (ECF No. 43-17,

---

[8] Mr. Spaniola testified in his deposition that, prior to the issuance of the misdemeanor charge, he had been contacted by a reporter from a local newspaper with questions regarding potential charges against plaintiff. He declined to answer the reporter's questions, noting that his practice was not to release such information

PageID.848). The press release included the potential maximum penalties for conviction, the fact that plaintiff had been released on bond, that Mr. Spaniola had been appointed special prosecutor, the specific allegations underlying the misdemeanor charge, and the name of plaintiff's counsel (Mark Quinn). (*Id.*). The press release ended with the admonition that plaintiff "is presumed innocent of this charge unless proven guilty in a court beyond a reasonable doubt." (*Id.*). The press release resulted in media reports in the local newspaper. (*See* ECF No. 57-11, PageID.1614).

Mr. Spaniola offered plaintiff various plea resolutions, including a dismissal of the charge in exchange for plaintiff's agreement to pay the city restitution. (Spaniola Dep. at 26, ECF No. 47-1, PageID.894). Mr. Quinn sent Mr. Spaniola a letter, dated March 26, 2014, advising that plaintiff had rejected the plea offers, including that he was "unwilling to make a financial offer that may result in the dismissal of charges." (ECF No. 58-13, PageID.1903). Consequently, Mr. Spaniola decided that he would no longer "cut [plaintiff] a break" and that he would file felony charges. (Spaniola Dep. at 25, ECF No. 47-1, PageID.893).

On April 3, 2014, Prosecutor Spaniola obtained a three-count felony warrant against plaintiff, charging embezzlement – agent or trustee, at least $999 but less than $20,000, MICH. COMP. LAWS § 750.174(4); public money – safe keeping, MICH.

_____

until after an individual has been arraigned. Mr. Spaniola then sent the reporter the press release after plaintiff's arraignment. (Spaniola Dep. at 19, ECF No. 47-1, PageID.892).

COMP. LAWS § 750.490; and embezzlement – public official, MICH. COMP. LAWS § 750.175. (Miller Report at 43, ECF No. 43-2, PageID.420). On April 15, 2014, plaintiff was arraigned on these charges. (*Id.*). The felony charges were reported in the media. (*See* ECF No. 57-13).

A preliminary hearing on the felony charges was held on May 7, 2014, before Manistee County District Judge Thomas Brunner. During the preliminary hearing, nine witnesses testified for the prosecution, including Utilities Director Jeffrey Mikula, City Treasurer Edward Bradford, and City Manager Mitchell Deisch. (Prelim. Tr., ECF No. 47-4). Messieurs Mikula, Bradford, and Deisch each testified either that he was not aware of, or did not recall, the city having a written policy concerning the disposal of scrap metal during plaintiff's employment. (*Id.* at 15, 39, 64, PageID.1019, 1043, 1069). Mr. Bradford testified, however, that he had twice advised plaintiff that any check reflecting the proceeds of the sale of the city's scrap metal needed to be brought to City Hall, and that all scrap metal proceeds had to be processed through the city. (*Id.* at 31, PageID.1035).[9]

At the conclusion of the preliminary hearing, plaintiff's counsel, Mr. Quinn, argued, among other things, that the historical use of the city's scrap metal proceeds for employee functions, coupled with a lack of a written policy regarding the use of those proceeds, precluded a probable cause finding of a knowing and unlawful

---

[9] In his deposition, plaintiff acknowledged that Mr. Bradford had informed him of the requirement that the checks be run through the city. (Garber Dep. at 74-75, ECF No. 47-2, PageID.928). Plaintiff also testified that, because Mr. Bradford was not his boss, he could ignore his instructions. (*Id.* at 75, 83, PageID.928, 930).

appropriation of city funds for plaintiff's own use. (*Id.* at 165-66, PageID.1170-71). Judge Brunner disagreed.

He found that the prosecution had met its burden of establishing probable cause that plaintiff committed the three felony offenses Mr. Spaniola had charged. Among other things, the judge noted the following:

> The primary focus of the prelim pertains to two checks issued by Padnos, exhibits one and two. Exhibit one is a check dated July 23, 2012, in the amount of $1787.53. The exhibit two is a check issued by Padnos on July 20, 2012, in the amount of $343.93. The payee on both of those checks is set forth as John Robert Garber, the Defendant in this case. Both checks were endorsed by John Robert Garber at Filer Credit Union in Manistee County. Mr. Garber had a personal account there. Mr. Garber, at the time of the cashing of these checks, was the Director of Public Works in the City of Manistee. The evidence indicates that these two checks were not endorsed over to the City of Manistee. There's no indications of any accountings from the Public Works Department in regard to the disposition of the proceeds.
>
> . . .
>
> These two particular checks, it's sufficient probable cause that they did come to Mr. Garber in his official capacity. The question becomes was there an unlawful knowing and unlawful appropriation of this money to his own use? In this case, the money was taken to – the checks were taken to the Filer Credit Union, they were cashed, and Mr. Garber received the cash from the bank. The two checks in question show that as having happened. The exhibit six shows the checks being cashed and the cash back, being provided to Mr. Garber. So that's what we have at this juncture of a probable cause hearing. We have City property, the scrap metal proceeds, having been check cashed, turned into cash, and the cash is in the pocket of Mr. Garber.

(Prelim. Tr. at 170-72, ECF No. 47-4, PageID.1175-77). Judge Brunner bound plaintiff over to circuit court on all three felony charges in the complaint. (*Id.* at 174, PageID.1179).

In August 2014, Mr. Quinn filed a motion to quash Judge Brunner's bind-over order. (Spaniola Dep. at 29, ECF No. 47-1, PageID.894). On November 20, 2014, Circuit Court Judge James Batzer held a hearing on that motion. Mr. Quinn conceded that plaintiff had received the city's scrap metal proceeds at issue, but he argued that there was insufficient evidence to establish probable cause that plaintiff knowingly and unlawfully converted the money to his own use, which is required to support each of the three charges. (Mtn Tr. at 4-11, ECF No. 57-6, PageID.1581-83). Circuit Judge Batzer agreed:

> Well, the problem that the prosecutor has in this case is that they can't show on a probable cause basis that this defendant dishonestly disposed of the money, or converted it to his own use, or took the money with the intent to convert it to his own use without consent of the city, or that he used it for an unauthorized purpose.

(*Id.* at 22-23, PageID.1585-86). The judge quashed the bind over. (*Id.* at 31, PageID.1588).

Prosecutor Spaniola elected not to appeal the dismissal of the case. In a January 14, 2015, email, Detective Miller asked Prosecutor Spaniola whether he should close the case and destroy any property he obtained during the course of the investigation. In response, Prosecutor Spaniola stated: "Yes, go ahead and destroy the property and close the complaint as 'case dismissed by Judge.'" (Email from Paul Spaniola to Mark Miller, dated Jan. 14, 2015, ECF No. 43-2, PageID.427).

3.   The Election

Plaintiff filed the necessary paperwork to seek election to a vacant city council position in May 2013, a month after his retirement from the Department of Public

15

Works. (Garber Dep. at 52-53, ECF No. 43-7, PageID.537). Plaintiff did not have election signs published or prepared. The election took place November 5, 2013, with Mark Wittliff being elected to the position. Plaintiff came in second in the three-way race, approximately fifteen votes behind Mr. Wittliff and roughly thirty votes ahead of the third-place candidate. No one told plaintiff that he or she would have voted for him but for the criminal charges pending against him. (*Id.* at 58-60, PageID.539).

Mr. Spaniola testified that he was unaware that plaintiff was running for elective office until sometime after he decided to file criminal charges against him. (Spaniola Dep. at 16, ECF No. 47-1, PageID.891).

Plaintiff filed the instant lawsuit on May 2, 2016.

## **Summary Judgment Standard**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations in his pleadings. *See Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012); *see also Scadden v. Werner*, 677 F. App'x 996, 1001 (6th Cir. 2017). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].' " *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016).

<u>**Discussion**</u>

**I.   Defendant Paul Spaniola Is Entitled To Summary Judgment.**

    A.   <u>Mr. Spaniola Enjoys Absolute Immunity Against Plaintiff's Federal Claims.</u>

Defendant Paul Spaniola is the elected Prosecutor of Mason County.  His involvement in this case was limited to his role as a Special Prosecutor for Manistee County.  He assumed responsibility for the Garber case at the request of the Manistee County Prosecutor, who was concerned about a potential conflict of interest.

Under common law, prosecutors enjoy absolute immunity for acts committed during the performance of their duties as advocates for the State.  *See Yaselli v. Goff*, 12 F.2d 396, 406 (2d Cir. 1926), *aff'd* 275 U.S. 503 (1927) (*per curiam*).  In *Imbler v. Pachtman*, the Supreme Court specifically recognized that prosecutors have immunity against Section 1983 claims.  424 U.S. 409, 424 (1976).  The Court noted:

> A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court.  The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.  Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate.

*Id.* at 424-25.  The Court also noted that, absent such immunity, "[the prosecutor's] energy and attention would be diverted from the pressing duty of enforcing the criminal law."  *Id.* at 425.  "To be sure, this immunity does leave a genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.  But the alternative of qualifying a prosecutor's

immunity would disserve the broader public interest. . . . [in] the vigorous and fearless performance of the prosecutor's duty. . . ." *Id.* at 427-28. Absolute immunity extends to the knowing use of false testimony, *see Burns v. Reed*, 500 U.S. 478, 485 (1991) (citing *Imbler v. Pachtman*, 424 U.S. at 426), and to the suppression of exculpatory evidence, *Koubriti v. Convertino*, 593 F.3d 459, 470 (6th Cir. 2010).

The courts have adopted a "functional approach" in determining whether the particular actions of a prosecutor are subject to absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)). This approach looks to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. at 486.

Functions subject to absolute immunity include "the initiation and pursuit of a criminal prosecution, including presentation of the state's case at trial," *Buckley v. Fitzsimmons*, 509 U.S. at 269, and the participation in a probable cause hearing, *Burns v. Reed*, 500 U.S. at 492. The prosecutor's acts prefatory to bringing charges, including interviewing witnesses and evaluating evidence, are likewise absolutely immunized. *Buckley v. Fitzsimmons*, 509 U.S. at 273. In *Imbler v. Pachtman*, the Supreme Court recognized that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." 424 U.S. at 431 n.33.

Administrative duties and purely investigatory activity that are *unrelated* to the preparation and prosecution of a criminal case are not entitled to absolute immunity, however. *See Buckley v. Fitzsimmons*, 509 U.S. at 273. Rather, these acts are subject to qualified immunity. *Id.* "When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Id.* (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973) (internal quotation marks omitted)). Merely providing legal advice to law enforcement is similarly subject to qualified immunity. *Burns v. Reed*, 500 U.S. at 492-95. Qualified immunity is the norm. *Malley v. Briggs*, 475 U.S. 335, 340 (1986).

Plaintiff's claims against defendant Spaniola arise out of his actions as Special Prosecutor in plaintiff's underlying criminal complaint. According to the complaint, Mr. Spaniola did not become involved until his October 8, 2013, appointment as Special Prosecutor by the Michigan Attorney General. (Complaint ¶ 22, ECF No. 1, PageID.5; Proposed First Amended Complaint ¶ 22, ECF No. 35, PageID.267).

Plaintiff argues that Prosecutor Spaniola is not entitled to absolute immunity for certain of his actions relating to the embezzlement investigation and for his actions relating to the issuance of the press release.[10] (Pltf Br.at 11-13, ECF No. 58,

_____

[10] In his response to defendant Spaniola's motion for summary judgment, plaintiff alleges that Mr. Spaniola ordered the destruction of evidence and that he withheld production of the press release in response to plaintiff's FOIA request. (Pltf Br. at 8, 13, ECF No. 58, PageID.1705, 1710). Neither allegation appears in the complaint or the proposed amended complaint, and neither is supported by affidavit or other admissible evidence. Accordingly, these allegations must be disregarded for purposes

20

PageID.1708-10). Specifically, in his proposed amended complaint, plaintiff alleges that, on October 11, 2013, Mr. Spaniola "asked [Detective] Miller to interview [Department of Public Works] employees Bifoss, Picardat and Oleinczak (sp)" in order to "delay requesting the arrest warrant." (Proposed First Amended Complaint ¶ 22, ECF No. 35, PageID.267). Plaintiff claims that Mr. Spaniola timed the arrest warrant and the issuance of the related press release in order to effect the outcome of the election for city council. (*Id.* at ¶¶ 22-25, PageID.267-68). Plaintiff also complains that Mr. Spaniola sent a letter to plaintiff's counsel in the criminal case "threatening to dismiss the misdemeanor charges and to bring criminal felony charges against Plaintiff for embezzling city funds[,] if Plaintiff did not accept a plea offer made by Defendant Spaniola." (*Id.* at ¶ 26, PageID.268). None of these allegations defeat absolute immunity.

Mr. Spaniola's request that Detective Miller interview Messieurs Bifoss, Picardat, and Oleniczak falls squarely within his role as the prosecutor. Mr. Spaniola asked that these additional witnesses be questioned because plaintiff had identified them as individuals who would corroborate his defense: that he properly handled the city's scrap metal proceeds, and that he used the funds for employee functions. (*See*

_____

of this Opinion. *See Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence."). Moreover, the perfunctory nature of these assertions warrants a finding that the issues have been waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation and citation omitted)).

Miller Report at 11, 39; ECF No. 43-2, PageID.388, 416). The information obtained from these witnesses was relevant to the issue of whether plaintiff could, and should, be charged with embezzlement. Directions to obtain additional information directly relevant to a charging decision are appropriate and well within the function performed by a prosecutor. Moreover, Detective Miller's report – the accuracy of which plaintiff concedes – indicates that the detective conducted these interviews without Mr. Spaniola. (*See id.* at 40-41, PageID.417-18). Mr. Spaniola is entitled to absolute immunity concerning his request that Detective Miller interview Messieurs Bifoss, Picardat, and Oleniczak. Because this activity falls within the function of a prosecutor, Mr. Spaniola's motive, to the extent it is in issue, is irrelevant.[11] *See, e.g., Imbler v. Pachtman*, 424 U.S. at 425.

Mr. Spaniola's issuance of a press release on November 1, 2013, followed plaintiff's public arraignment earlier that day. (ECF No. 43-17, PageID.848). Prior to the arraignment, Mr. Spaniola had been contacted by a reporter from a local newspaper with questions regarding potential charges against plaintiff. He declined to answer the reporter's questions because his practice was not to release such information until after an individual had been arraigned. (Spaniola Dep. at 19, ECF No. 47-1, PageID.892). The press release included the potential maximum penalties for conviction, the fact that plaintiff had been released on bond, that Mr. Spaniola

---

[11] This would include plaintiff's allegation that Prosecutor Spaniola was motivated, at least in part, to promote his candidacy for Circuit Court Judge. (*See* Proposed First Amend. Complaint ¶ 58, ECF No. 35, PageID.275-76).

had been appointed special prosecutor, the specific allegations underlying the misdemeanor charge, and the name of plaintiff's counsel (Mark Quinn). (ECF No. 43-17, PageID.848). The press release ended with the admonition that plaintiff "is presumed innocent of this charge unless proven guilty in a court beyond a reasonable doubt." (*Id.*).

While the issuance of a press release is not necessary to the prosecution of a criminal case, it is certainly a function typically performed by a prosecutor that is directly *related* to the prosecution of the criminal case. The public generally has a right to know what is occurring in its courts and what actions its public servants are taking. The Supreme Court has recognized a qualified right of public *access* even to preliminary criminal proceedings where there has been "a tradition of accessibility" and when public access "plays a significant role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court of California* (*Press Enterprise II*), 478 U.S. 1, 8-9 (1986).

It is hardly surprising that the media would express interest in a criminal case involving the former Director of Public Works for the City of Manistee. Prosecutor Spaniola received a media request for information and he deferred providing that information until after a public arraignment had been conducted. The press release contained nothing but factual information the public could have obtained from the court docket, and it included an admonition regarding the presumption of innocence. Accordingly, Mr. Spaniola was acting within the functions of a prosecutor when he issued the press release.

23

Plaintiff's allegations regarding Mr. Spaniola's "threat" to charge plaintiff with a felony unless he accepted the prosecutor's misdemeanor plea offers fares no better. In *Bordenkircher v. Hayes*, a Kentucky grand jury charged Hayes with uttering a forged instrument in the amount of $88.30, an offense for which the maximum penalty was ten years' imprisonment. 434 U.S. 357, 358 (1978). The prosecutor offered to recommend a five-year sentence if Hayes would plead guilty to the charge. The prosecutor also advised Hayes that, if he did not accept the plea proposal, he would seek an indictment under Kentucky's Habitual Criminal Act, "which would subject Hayes to a mandatory sentence of life imprisonment by reason of his two prior felony convictions." *Id.* at 358-59. Hayes rejected the plea offer, was convicted at trial of the enhanced charge, and was given a life sentence. *Id.* at 359.

The Supreme Court rejected Hayes' contention that the prosecutor had violated his due process rights. *Id.* at 364-65. In reaching its decision, the Court noted:

> While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable" – and permissible – "attribute of any legitimate system which tolerates and encourages the negotiation of pleas." It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty.

*Id.* at 364 (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973)).

As is evident from the Supreme Court's holding in *Bordenkircher v. Hayes*, Prosecutor Spaniola's plea negotiation strategy was constitutional, and, more to the

point, well within the proper function of a prosecutor.  Mr. Spaniola is entitled to absolute immunity as to his conduct in the plea negotiation process.[12]

B.  <u>In the Alternative, Mr. Spaniola Enjoys Qualified Immunity on Plaintiff's Federal Claims.</u>

Even if the Court were to find that defendant Spaniola was not entitled to absolute immunity for his actions relating to the investigation and issuance of the press release, he would still be entitled to qualified immunity with respect to the federal claims.  *See Buckley v. Fitzsimmons*, 509 U.S. at 273.  Defendant Spaniola asserted the affirmative defense of qualified immunity in his answer.  (*See* ECF No. 6, PageID.84).  "Once [an] official[ ] raise[s] the qualified immunity defense, the plaintiff bears the burden to 'demonstrate that the official [is] not entitled to qualified immunity.' "  *LeFever v. Ferguson*, 645 F. App'x  438, 442 (6th Cir. 2016) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *see Hermansen v. Thompson*, 678 F. App'x 321, 325 (6th Cir. 2017).

"A government official sued under section 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *see Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Lane v.*

---

[12] During oral argument on the pending motions, plaintiff's counsel asked the Court to consider the decision in *Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003).  The Court has done that.  That decision does not warrant a different outcome.  In that case, the Sixth Circuit held that a prosecutor was not acting as an advocate, and not entitled to absolute immunity, for his actions in threatening a witness more than a year after the conclusion of the criminal proceedings.  *Id.* at 798.  The significance of the factual distinction between that case and the instant case needs no explanation.

*Franks*, 134 S. Ct. 2369, 2381 (2014). The first prong of qualified immunity analysis is whether the plaintiff has alleged facts showing that defendant's conduct violated a constitutional or statutory right.[13] *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong is whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* Trial courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Supreme Court has repeatedly held that the second prong of the qualified immunity analysis " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. at 201); *see White v. Pauly*, 137 S. Ct. 548, 552 (2017). Moreover, courts are "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v.*

---

[13] A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. At the summary judgment stage, "the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which a jury could reasonably find for the plaintiff.' " *Thompson v. City of Lebanon, Tenn.*, 831 F.3d 366, 369-70 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256); *see Gardner v. Evans*, 811 F.3d 844, 846 (6th Cir. 2016); *see also Zuhl v. Haskins*, 652 F. App'x 358, 361(6th Cir. 2016).

*Rickard*, 134 S. Ct. 2012, 2023 (2014) (citations and quotations omitted); *see White v. Pauly*, 137 S. Ct. at 552.

As demonstrated below, plaintiff has failed to establish a violation of any of his rights under the First or Fourth Amendments. Accordingly, defendant Spaniola is entitled to qualified immunity on each of the federal claims.

The Court also notes, with respect to Prosecutor Spaniola's issuance of a press release, that the Supreme Court has held that no violation of the "right to privacy" under the First and Fourth Amendments occurs with the publication of an individual's arrest. *Paul v. Davis*, 424 U.S. 693, 712-13 (1976). Similarly, in *Bailey v. City of Port Huron*, the Sixth Circuit affirmed summary judgment in favor of the city on a Section 1983 claim regarding the publication of information relating to criminal charges. 507 F.3d 364 (6th Cir. 2007). The Sixth Circuit noted: "As a matter of federal constitutional law, a criminal suspect does not have a right to keep her mug shot and the information contained in a police report outside of the public domain – and least of all from legitimate requests for information from the press." *Id.* at 368.

Accordingly, even if he is not entitled to absolute immunity regarding the issuance of the press release, Prosecutor Spaniola is entitled to qualified immunity on plaintiff's federal claims.

C.    <u>Mr. Spaniola Enjoys Absolute Immunity Against Plaintiff's State Claims.</u>

Inasmuch as the Court has determined that all of Mr. Spaniola's conduct relating to plaintiff's claims fell within his role as prosecutor, he is entitled to absolute immunity as against plaintiff's state-law claims. Under Michigan statutory law, "the

elective or highest appointed executive official of all levels of government [is] immune from tort liability for injuries to persons . . . if he or she is acting within the scope of his or her . . . executive authority." MICH. COMP. LAWS § 691.1407(5). Mr. Spaniola, appointed to serve as the Manistee County Prosecutor for the Garber case, falls within the ambit of this immunity provision. *Cf. Bischoff v. Calhoun Cty. Prosecutor*, 173 Mich. App. 802, 806 (1988) ("We hold defendant to be immune from liability under [§ 691.1407(5)] of the governmental immunity statute. Defendant prosecutor is the chief law enforcement officer of the county." (citing *Genesee Prosecutor v. Genesee Circuit Judge*, 386 Mich. 672, 683 (1972)).

All of plaintiff's state-law claims (Counts IV through VII) sound in tort. Accordingly, Prosecutor Spaniola is entitled to absolute immunity as to these claims.

## II. The City of Manistee is Entitled to Summary Judgment.

The City of Manistee argues that it is entitled to summary judgment because plaintiff has failed to show a policy or custom upon which to base a Section 1983 claim, and that the city is immune from state tort liability. Before addressing these arguments, the Court notes that the only reference in plaintiff's complaint to the City of Manistee is found in the caption and in the section identifying the parties. *See* Complaint ¶ 3, ECF No. 1, PageID.2).[14] A complaint that merely names a defendant without alleging *specific* conduct by that defendant is subject to summary dismissal.

---

[14] In his proposed amended complaint, plaintiff merely adds a cryptic reference in Count VII that the city "concurred" in the actions of defendants. (Proposed First Amended Complaint ¶ 82, ECF No. 35, PageID.284).

*See Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1994); *Cameron v. Howes*, No. 1:10-cv-539, 2010 WL 3885271, at *6 (W.D. Mich. Sept. 28, 2010) (collecting cases).

A. <u>Plaintiff has failed to establish municipal liability for his federal claims.</u>

To prevail on a Section 1983 claim against the City of Manistee, plaintiff must demonstrate that the alleged violations of his federal rights were caused by a municipal policy or custom. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The plaintiff must " '(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy.' " *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010) (quoting *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005)); *see also Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Neither plaintiff's pending complaint nor his proposed amended complaint contain any reference to a city policy or custom.[15] In fact, there is no reference at all to the City of Manistee within the Section 1983 claims. As plaintiff's complaint fails to state a claim under Section 1983 against the City of Manistee, those claims will be dismissed as against the city.

---

[15] Plaintiff's arguments concerning *Monell* liability in his response to the motion for summary judgment (*see* Pltf Br. at 27-28, ECF No. 57, PageID.1458-59), are not a substitute for allegations in a complaint. *See Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1358 (11th Cir. 1998); *see also Taylor v. Jewish Hosp.*, No. 3:13-cv-361, 2013 WL 5888276, at *2 (W.D. Ky. Oct. 31, 2013) ("Although it is true that the plaintiff is the master of the claim, the plaintiff must exercise his mastery in the complaint itself, not via statements made for the first time in his briefs.") (citation and quotation omitted).

B.  The City is protected by government immunity against state tort claims.

Under Michigan's Governmental Tort Liability Act, the City of Manistee is immune from state tort liability.  That statute provides, with certain exceptions inapplicable here, that "a government agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a government function."  MICH. COMP. LAWS § 691.1407(1).  The City of Manistee is a government agency for purposes of the tort immunity statute.  *See* MICH. COMP. LAWS § 691.1401(1)(d), (e).

Plaintiff offers no argument in his response to the pending motion to suggest that the city is not entitled to the state's tort immunity.  The state tort claims against the city will be dismissed.

III.  **The Individual City Defendants Are Entitled to Summary Judgment.**

A.  Plaintiff Fails to State a Claim Under 42 U.S.C. § 1985.

In Count I of the complaint, plaintiff claims that the five individual defendants conspired to violate his First Amendment right "to run for public office," in contravention of 42 U.S.C. § 1985.  (Complaint ¶ 38, ECF No. 1, PageID.7).  Plaintiff cites subsection (2) of section 1985 as the basis for this cause of action.  (*See id.*).  But, that subsection addresses conspiracies to obstruct justice, which is plainly inapposite to plaintiff's allegation that the defendants interfered with his election.  Plaintiff now asserts that the citation to subsection (2) is a typographical error, and that he intended to cite subsection (3).  (Pltf Resp. at 7, ECF No. 57, PageID.1438).  The Court will give plaintiff the benefit of the doubt and treat the complaint as if it were

amended to cite 42 U.S.C. §1985(3).  Unfortunately for plaintiff, that concession will do him no good.

Subsection (3) of section 1985 provides a cause of action against those who conspire to deprive individuals of their equal protection rights.  As such, it is necessary to allege and prove that the defendants' conduct in question was motivated by plaintiff's membership in a constitutionally-protected class – for example, his race. *See Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000) (A Section 1985(3) claim requires proof of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." (citing *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983)); *see also Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) ("To sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and discrimination on account of it." (citing *Bartell*, 215 F.3d at 559)).  The Supreme Court noted that "[t]he civil conspiracy prohibition contained in § 1985(3) was enacted as a significant part of the civil rights legislation passed in the aftermath of the Civil War."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865 (2017) (citations omitted).

None of the allegations in the complaint (or the proposed amended complaint) so much as suggests that plaintiff was a member of a constitutionally-protected class; nor is there any assertion that the defendants were motivated by any class-based discriminatory animas.  As such, plaintiff fails to state an equal protection claim. Count I will be dismissed.

## B.    Plaintiff Fails to State a First Amendment Claim.

In Count II, plaintiff raises a claim, pursuant to 42 U.S.C. § 1983, that the individual defendants violated his "right to be a candidate for public office" by delaying the issuance of the arrest warrant on the misdemeanor embezzlement charge to shortly before the election.  (Complaint ¶¶ 45, 47, ECF No. 1, PageID.9). Plaintiff asserts that, under the First Amendment, "[he] had a lawful right to run for a position on the City Council."  (*Id*. at ¶ 48).

Section 1983 imposes civil liability on a person acting under color of state law who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "By its terms . . . the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *Oklahoma City v Tuttle*, 471 U.S. 808, 816 (1985).  A Section 1983 claim has two basic requirements:  (1) state action, and (2) a deprivation of a federal statutory or constitutional right.  *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001) (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) and *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992)).

Accordingly, in order to have a viable cause of action under Section 1983, plaintiff must demonstrate that the defendants deprived him of a cognizable right under the First Amendment.  Plaintiff argues that he had a First Amendment right to run for elected office without interference.  The Court must disagree.

In *Bullock v. Carter*, the Supreme Court considered a challenge to the constitutionality of a Texas primary election filing fee.  405 U.S. 134 (1972).  The

Court held that, because the state failed to establish the requisite justification, the filing fee constituted a denial of equal protection of the laws. *Id.* at 149. The *Bullock* decision does not specifically address the issue before this Court. But, in addressing the "threshold question" of the appropriate standard of review, the Supreme Court noted that candidacy for public office is not a fundamental constitutional right to which a rigorous standard of review would apply. *Id.* at 142-43; *see also Clements v. Fashing*, 457 U.S. 957, 963 (1982) ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.' " (citing *Bullock v. Carter*, 405 U.S. at 143)).

The Sixth Circuit, relying in part on the *Bullock* decision, held that there is no protected right to candidacy under the First Amendment. *Carver v. Dennis*, 104 F.3d 847, 850-51 (6th Cir. 1997) (citing *Bullock v. Carter*, 405 U.S. at 143). In subsequent cases, the Sixth Circuit has reaffirmed this holding. *See Molina-Crespo v. United States Merit Sys. Prot. Bd.*, 547 F.3d 651, 656 (6th Cir. 2008) ("[B]oth this Court and the Supreme Court have held that 'there is no protected right to candidacy under the First Amendment[.]' " (quoting *Murphy v. Cockrell*, 505 F.3d 446, 450 (6th Cir. 2007)). Because there is no First Amendment right to be a candidate for public office, plaintiff has no viable cause of action under Section 1983 on that basis.

During oral argument, plaintiff's counsel acknowledged the adverse holdings described above, and he conceded that he could find no legal authority to support the proposition that the First Amendment protects candidacy for public office. Instead, counsel asserted that plaintiff had a First Amendment right to run for election free

of interference from defendants' actions. This appears, at first blush, to be an argument based on semantics – a distinction without a difference.

To the extent plaintiff is claiming that the defendants' actions were intended simply to interfere with his candidacy to prevent his election, as opposed to punishing him for the contents of his election-related statements, there is no significant distinction. *See Greenwell v. Parsley*, 541 F.3d 401, 404 (6th Cir. 2008) ("While the First Amendment protects the right of public employees to speak out on matters of public concern, it has not been extended to candidacy alone." (citing *Carver v. Dennis*, 104 F.3d at 849, and *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Any putative constitutional right to candidacy would necessarily include the right to be free from undue interference with that candidacy, and vice versa. The Court has been unable to find any legal authority for the proposition that the First Amendment – or any other constitutional provision – creates a right to an interference-free election. The Court declines plaintiff's invitation to recognize such a right as a matter of first impression.

Giving plaintiff the benefit of the doubt, however, the Court recognizes that the First Amendment may be implicated if a state actor takes action to punish a candidate due to the contents of the candidate's campaign statements. In *Murphy v. Cockrell*, the Sixth Circuit held that the content of a public employee's campaign speech is protected by the First Amendment. 505 F.3d at 452. The Sixth Circuit has recognized that "cases involving political speech by public employees proceed on a continuum" and that "drawing a clear line between the simple announcement of a

candidacy, which does not trigger protected political speech, and an announcement coupled with speech critical of one's opponent (and boss), which does trigger constitutional protection, is not an easy task." *Greenwell v. Parsley*, 541 F.3d 401, 404 (6th Cir. 2008).

That problem does not arise in this case, however. Nowhere in his complaint does plaintiff allege that he was discriminated against on the basis of the content of his campaign speech. In fact, plaintiff's complaint tells the Court nothing about his campaign rhetoric, much less, does he allege that any of the defendants took issue with it. Accordingly, Count II fails to state a cognizable claim, and it will be dismissed.

Moreover, plaintiff has offered nothing but speculation to establish that the defendants' alleged conduct was the actual ("but-for") cause of his election loss, which is a necessary element of a Section 1983 claim. *See Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007). Plaintiff states that he lost the election by about fifteen votes to the successful candidate, and that the obtained approximately thirty more votes than the third-place candidate. (Garber Dep. at 59, ECF No. 43-7, PageID.539). Plaintiff also acknowledges that no voter indicated that his or her decision was affected by the filing of criminal charges; in fact, plaintiff conceded that no one had mentioned the criminal charges at all. (*Id.* at 59-60). Plaintiff has nothing but the timing of the criminal charges, which predated the election, to support his claim that the filing of the criminal charges caused him to lose the election. (*Id.* at 58-60). As plaintiff has conceded, whether he would have won

the election had the timing of the criminal charges been different is a matter of speculation. (*Id.* at 60). "[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment." *Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017).

### C.    Plaintiff's Fourth-Amendment Claim Fails as a Matter of Law.

In Count III, plaintiff claims that defendants Deisch, Bachman, Bradford and Mikula conspired to institute a criminal investigation against him, without probable cause, "which they knew, or should have known was not based upon fact or evidence that Plaintiff had embezzled city funds." (Complaint ¶ 53, ECF No. 1, PageID.11). Plaintiff also contends that the defendants (presumably to include defendant Spaniola) violated his Fourth Amendment rights "when they threatened Plaintiff with a dismissal of the misdemeanor charge and the institution of felony charges, using the same evidence, . . . if he refused to plead guilty to the misdemeanor charge." (*Id.* at ¶ 58, PageID.12).

As plaintiff concedes, his claim under Count III fails as a matter of law if the misdemeanor warrant for embezzlement was supported by probable cause. (Pltf Br. at 11, ECF No. 57, PageID.1442 (citing *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669 (6th Cir. 2005)). In *Voyticky*, the Sixth Circuit noted that, "[i]n order to prove malicious prosecution under federal law, a plaintiff must show, at a minimum, that there is no probable cause to justify an arrest or a prosecution." 412 F.3d at 675 (citing *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)).

1.  <u>There was probable cause to support the charge against plaintiff.</u>

In this case, there was probable for the misdemeanor embezzlement charge under MICH. COMP. LAWS § 750.174(3).  Under Michigan law, the elements of that offense, as applied to the underlying criminal case, are the following:  (1) the money in question must have belonged to the City of Manistee; (2) plaintiff (Mr. Garber) must have had a relationship of trust with the city as its agent or employee; (3) the money must have come into plaintiff's possession because of the relationship of trust; (4) plaintiff dishonestly disposed of, or converted the money to his own use, or secreted the money; (5) the act must have been without the consent of the city; and (6) at the time of conversion, plaintiff intended to defraud or cheat the principal.  *People v. Lueth*, 253 Mich. App. 670, 683-84 (2002) (citing *People v. Collins*, 239 Mich. App. 125, 131 (1999) and *People v. Wood*, 182 Mich. App. 50, 53 (1990)).  The first three elements are not disputed.

The fourth and fifth elements are plainly established by the undisputed facts that plaintiff deposited at least two checks representing the city's scrap metal proceeds into his personal bank account, taking the cash into his possession, and that there was no record that any of these funds were ever turned over to the city.  (*See* Prelim. Tr. at 170-72, ECF No. 47-4, PageID.1175-77).  As District Judge Brunner concluded:

> The question becomes was there an unlawful knowing and unlawful appropriation of this money to his own use?  In this case, the money was taken to – the checks were taken to the Filer Credit Union, they were cashed, and Mr. Garber received the cash from the bank.  The two checks in question show that as having happened.  The exhibit six shows the checks being cashed and the cash back, being provided to Mr. Garber.

37

> So that's what we have at this juncture of a probable cause hearing. We
> have City property, the scrap metal proceeds, having been check cashed,
> turned into cash, and the cash is in the pocket of Mr. Garber.

(*Id.* at 172, PageID.1177). City Treasurer Bradford testified that, prior to 2012, he had twice discussed with plaintiff the sales of the city's scrap metal, and that he had instructed plaintiff that "any checks for scrap needed to come back to City Hall and they needed to come straight to there," and that "all money needs to come through City Hall." (*Id.* at 31, PageID.1035). Plaintiff concedes this point. (*See* Garber Dep. at 74-75, ECF No. 47-2, PageID.928).

The only serious dispute concerns the final element: whether plaintiff intended to defraud or cheat the principal. This was the issue of concern for Circuit Judge Batzer. (*See* Mtn Tr. at 22, ECF No. 57-6, PageID.1585-86). The Sixth Circuit Pattern Jury instruction on Inferring Required Mental State is instructive here. It provides, in pertinent part:

> Ordinarily, there is no way that a defendant's state of mind can be
> proved directly, because no one can read another person's mind and tell
> what that person is thinking.
>
> But a defendant's state of mind can be proved indirectly from the
> surrounding circumstances. This includes things like what the
> defendant said, what the defendant did, how the defendant acted, and
> any other facts or circumstances in evidence that show what was in the
> defendant's mind.
>
> You may also consider the natural and probable results of any acts that
> the defendant knowingly did or did not do, and whether it is reasonable
> to conclude that the defendant intended those results.

SIXTH CIRCUIT PATTERN CRIM. JURY INSTR. 2.08 (2017).

The intent to defraud the city can be inferred by plaintiff's continued practice – despite the City Treasurer's admonition to the contrary – of depositing city checks into his personal bank account, taking the cash, and spending it without the approval of city officials. Padnos records showed fifteen scrap metal sales involving plaintiff between November 2006 and July 2012. In twelve of these transactions, checks were issued payable to plaintiff; in three others, plaintiff was paid in cash. All twelve checks were endorsed by plaintiff and either cashed or deposited into his personal bank account. Plaintiff endorsed and deposited into his personal account two other checks that had been made payable to another Department of Public Works employee. According to the City Treasurer, none of these proceeds, totaling $9,357.83, were ever turned over to the city.

During the same time period, Padnos issued checks to other city employees on eight occasions. The records reflect that the proceeds from each of these scrap metal sales were deposited into the city's bank account. Detective Miller learned that, when Edward Cote, the former supervisor of the City Water Department, received scrap metal proceeds from Padnos, he deposited the funds into the city's bank account. Mr. Cote also submitted a letter, dated June 18, 2007, to the City Treasurer seeking permission to use scrap metal proceeds to purchase items for his department.

Plaintiff appears to be the only city employee who failed to turn scrap-metal proceeds over to the city. Moreover, in a discussion with Police Chief Bachman, plaintiff made statements concerning his handling of the Padnos checks, which have been contradicted by the Padnos and bank records: "[Plaintiff] told him that he has

never signed or endorsed a check for the City . . . . [Plaintiff] also told Chief Bachman that any checks he has received he has turned over to . . . the Treasurer's Office and he has no idea what happened to them after that." (Miller Report at 9, ECF No. 43-2, PageID.386). Plaintiff also told Chief Bachman, at one point, that he paid for the employee Christmas parties with his own money. (*Id.* at 44, PageID.421). False exculpatory statements may be considered in determining whether they constitute consciousness of guilt. *See, e.g., Stanley v. United States*, 245 F.2d 427, 433 (6th Cir. 1957).

Even if this Court is to assume that Chief Bachman's accounts of plaintiff's statements are inaccurate, the fact remains that this information was contained in Detective Miller's report. Prosecutor Spaniola relied upon the information in that report in making his charging decision.

In April 2013, two individuals who are nonparties to this case separately found probable cause of criminal activity relating to plaintiff's bank account. This included the Manistee County Chief Assistant Prosecutor, who reviewed and approved the affidavit supporting the search warrant for those records, and District Judge Brunner, who authorized the search warrant based on the same affidavit. (*See* Miller Report at 36, ECF No. 43-2, PageID.413). Judge Brunner later specifically found probable cause that plaintiff committed the crime of embezzlement following a May 7, 2014, preliminary hearing.

Plaintiff contests the finding of probable cause on two pieces of evidence: the city defendants' concession that "there was not a written policy relating to the

collection of scrap, the sale of scrap and how the money was to be used," and that City Manager Deisch told Detective Miller that, "as of April 2013, the policy of selling scrap metal and using for social events at the [Department of Public Works] was a permissible use of the city funds." (Pltf Br. at 12-13, ECF No. 57, PageID.1443-44). Plaintiff cites to this evidence, of course, because he believes it tends to support his claim that he used the cash he obtained from the city's scrap metal checks to pay for employee social events.

Plaintiff misses the point. There is no requirement that an employer have a specific policy about how money is to be used for a viable embezzlement charge. All that is required is that the employee converted the employer's funds without permission with the intent to defraud. *See People v. Lueth*, 253 Mich. App. at 683-84. Moreover, plaintiff reads too much into Mr. Deisch's statements to Detective Miller. Mr. Deisch simply noted that, "to his knowledge some City money was still being utilized to pay for at least some of the costs for the employee picnic and Christmas parties." (Miller Report at 7-8, ECF No. 43-2, PageID.384-85). Mr. Deisch's statements do not confirm plaintiff's contention that the money *he* took from the city's scrap metal sales was *actually* used for employee functions.

Moreover, the very employees plaintiff contended would corroborate his claim of using the scrap metal proceeds for "retirements, cookouts, Christmas parties and buying some tools" (Pltf's Letter to Chief Bachman, March 29, 2013 (contents in Miller Report at 11, ECF No. 43-2, PageID.388)) contradicted, for the most part, his defense. Plaintiff complains about the fact that Prosecutor Spaniola delayed issuance

of the misdemeanor warrant pending the interview of three additional witnesses, asserting it was "needless." (Complaint ¶ 49, ECF No. 1, PageID.10; Proposed First Amended Complaint ¶ 49, ECF No. 35, PageID.273). But, Mr. Spaniola directed that those additional witnesses (Messieurs Bifoss, Picardat, and Oleniczak) be questioned because plaintiff had identified them as individuals who would corroborate his contentions that he properly handled the city's scrap metal proceeds, and that he used the funds for employee functions. (*See* Miller Report at 11, 39; PageID.388, 416). They did neither.

Mr. Bifoss advised Detective Miller that, while he recalled "that some City money could have been used [for employee parties and picnics] . . . he [did] not recall anything specific." (*Id.* at 40, PageID.417). Mr. Bifoss also stated, however, that "clearly, any proceeds coming into the City from any source would need to go directly to the City." (*Id.*). Mr. Picardat stated that he was unaware of any scrap metal proceeds being used to fund employee parties or picnics, or to purchase tools. (*Id.*). He advised that, while he had not been specifically told to submit all sales proceeds to city hall, he knew to do that, describing it as an ethical issue. (*Id.*). Mr. Oleniczak stated that, during his time with the city, scrap metal was sold to a local scrap dealer, and that the dealer made the payments directly to the city. (*Id.* at 41, PageID.418). He advised that, to the best of his knowledge, no city money was used to fund parties or picnics. (*Id.*).

Rather than corroborate his defense, these witness statements provide additional evidence to establish probable cause that plaintiff had converted the city's

scrap metal proceeds to his personal use. Those statements, coupled with plaintiff's intentional disregard of the City Treasurer's directive to submit all city funds through City Hall and his false statements concerning his handling of scrap metal proceeds, is sufficient to establish probable cause that plaintiff intended to defraud the city of at least some of its funds.

The probable cause standard is not particularly onerous, although it is not without some teeth. " 'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.' " *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (*en banc*)). This is a "flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "[T]he establishment of probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *United States v. McClain*, 444 F.3d at 562 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). "The totality of the circumstances are examined to determine whether the officers had sufficient knowledge for a prudent person to believe that the arrested individual committed an offense." *Buckner v. Rini*, No. 11-13623, 2013 WL 1720831, *3 (E.D. Mich. Apr. 22, 2013) (citing *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010)).

The evidence outlined in Detective Miller's report – the accuracy of which plaintiff has conceded – is sufficient to establish probable cause that plaintiff embezzled the City of Manistee's scrap metal proceeds. The lack of a written policy concerning scrap metal sales and the evidence that such funds had, in the past, been

used for employee functions, may well raise reasonable doubt, but this evidence does not defeat probable cause.

2. <u>The individual City Defendants are protected by qualified immunity.</u>

Like Prosecutor Spaniola, the individual city defendants are entitled to qualified immunity regarding plaintiff's federal claims (*see* discussion, *supra*, regarding the standards for qualified immunity). In order to defeat defendants' assertion of qualified immunity, plaintiff must show both that defendants violated one of his constitutional rights and that the right was "clearly established" at the time of defendants' alleged misconduct. *See Saucier v. Katz*, 533 U.S. at 201. The Court has already determined that plaintiff has failed to establish a constitutional violation.

Even if there had been a constitutional violation, however, defendants would still be entitled to qualified immunity, as plaintiff has failed to demonstrate that any such right was "clearly established" during the relevant time period. Plaintiff concedes that he could find no case law – or other legal authority – for the proposition that he had a First Amendment right to run for office interference free. Instead, he invites this Court to recognize this right as a matter of first impression. Even if the Court were to accept that invitation, the fact that plaintiff acknowledges that this is a matter of first impression demonstrates that it was not established – much less clearly established – in 2013, when the events leading to this lawsuit occurred.

Plaintiff also fails to establish that the conduct underlying his Fourth Amendment claim was such as to place beyond debate its constitutional infringement.

The Fourth Amendment claim under Section 1983 cannot stand if there was probable cause to support plaintiff's arrest and prosecution for embezzlement.  As noted above, District Judge Brunner twice found probable cause linking plaintiff to the crime of embezzlement – the first time to authorize the seizure and search of plaintiff's bank records; the second, to bind him over on three felony charges relating to the alleged embezzlement.  No one has suggested that Judge Brunner was biased or otherwise lacking in prudence.

Instead, plaintiff points to the fact that Circuit Court Judge Batzer granted plaintiff's motion to quash Judge Brunner's bindover.  But the fact that two impartial judges disagree on the import of the evidence demonstrates that the issue of whether there was probable cause to support the embezzlement charge is very much subject to reasonable debate.  *Cf. Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

D.    <u>The Individual City Defendants are Protected by Government Immunity on Plaintiff's State Law Tort Claims.</u>

The individual city defendants are entitled to government immunity on plaintiff's state law tort claims (Counts IV through VII).  Michigan law provides the elective or highest appointed executive official immunity from tort liability for actions taken within the scope of his or her official authority.  MICH. COMP. LAWS § 691.1407(5).  To overcome this immunity, plaintiff must establish either that defendants' actions fell within a statutory exception or that defendants' actions

45

occurred outside the exercise of a government function. *Genesee Cty. Drain Comm'r v. Genesee Cty.*, 309 Mich. App. 317, 326-27 (2015). When considering the latter, courts are to examine the "*general activity* involved rather than the *specific conduct* engaged in when the alleged injury occurred." *Id.* at 328. (citations omitted) (emphasis in *Genesee Cty.*). The statute does not contain an exception for intentional torts. *Id.* at 328.

City Manager Deisch is the highest appointed official in the City of Manistee. (*See* Manistee City Charter §§ 2-14, 5-1, 5-3, 13-10; ECF No. 43-16, PageID.843-44, 846). Public Safety Director (Police Chief) Bachman is the highest appointed executive official in the Manistee Police Department. *See Petipren v. Jaskowski*, 494 Mich. 190, 215-16 (2013). There is no applicable statutory exception to defendants' assertion of immunity. Moreover, defendant Deisch and Bachman's involvement in the matters underlying plaintiff's claims were each plainly within the scope of the "general activity" of their respective positions. Accordingly, they are immune from plaintiff's state law tort claims.

The other two individual city defendants – Utilities Director Mikula and City Treasurer Bradford – enjoy qualified immunity from intentional tort liability under Michigan common law. *See Odom v. Wayne Cty.*, 482 Mich. 459, 461 (2008). These public employees are entitled to qualified immunity, provided: (1) their challenged actions were taken during the course of their employment and that they were acting, or reasonably believed they were acting, within the scope of their authority; (2) the actions were taken in good faith; and (3) their actions were discretionary in nature.

*Id.* at 473-76. Defendants bear the burden of establishing their entitlement to qualified immunity. *Id.* at 476-79. [16]

In Count IV, plaintiff claims that "[t]he individual Defendants" conspired to have him falsely arrested to ruin his reputation and to prevent him from being elected to public office. (Complaint ¶¶ 62-63, ECF No. 1, PageID.13; Proposed First Amended Complaint ¶¶ 62-63, ECF No. 35, PageID.277-78). Plaintiff does not identify which defendants allegedly participated in the conspiracy in either the pending complaint or the proposed amended complaint – the Court will assume he intended to name all the individual defendants in this count.[17]

In Count VI, plaintiff alleges that defendants submitted information to Detective Miller, through Sergeant Riley, that they "knew or should have known . . . was false," and that defendants Bradford and Mikula "repeated the false allegations" during their respective interviews with the detective. (Proposed First

---

[16] While plaintiff challenges defendants' assertion of state statutory immunity, he does not address their assertion of common law qualified immunity. (*See* Pltf Br. at 25-27, ECF No. 57, PageID.1456-58). Accordingly, he has arguably waived this issue. *See Berryman v. Sampson*, No. 10-12169, 2012 WL 1570839, at *1 (E.D. Mich. May 3, 2012) ("[F]ailure to address an issue constitutes a waiver or abandonment of the argument.") (citing *Sault St. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)).

[17] Plaintiff does not include either Mr. Bradford or Mr. Mikula in Count V. Accordingly, the Court need not address qualified immunity with respect to that count.

Amended Complaint ¶¶ 74-75, ECF No. 35, PageID.282).[18]  Plaintiff does not identify what information defendants provided that was false.

In Count VII, plaintiff alleges that the conduct of the defendants – presumably all of them – "constitute[d] extreme and outrageous conduct which is not sanctioned or condoned by society."  (Complaint ¶ 80, ECF No. 1, PageID.19; Proposed First Amended Complaint ¶ 80, ECF No. 35, PageID.284).  Plaintiff does not specify the conduct he alleges was extreme and outrageous, except in paragraph 83 to make reference to paragraphs 9 through 33 of the complaint, which recount plaintiff's allegations relating to the investigation and prosecution for embezzlement.

There is no genuine dispute as to the facts that defendants Bradford and Mikula's actions with respect to the claims in Counts IV, VI and VII, were taken during the course of their employment, that they reasonably believed they were acting within the scope of their authority, and that their actions were discretionary. The only potential issue is whether their actions were taken in good faith.  The Michigan Supreme Court counsels that good faith is "acting without malice," and described the absence of good faith to include " 'malicious, corrupt, and otherwise outrageous conduct.' "  *Odom v. Wayne Cty.*, 482 Mich. at 474 (quoting Prosser, TORTS (4th ed.), § 132, p. 989)).

---

[18] The pending complaint includes similar allegations, but it does not specifically name defendants Bradford and Mikula.  (*See* Complaint ¶¶ 74-75, ECF No. 1, PageID.17).

According to Detective Miller's report – the accuracy of which plaintiff has conceded – there is no evidence that defendants Bradford or Mikula provided any false information during the investigation; nor is there any evidence that they acted with malice. Utilities Director Mikula's involvement in this matter began when "several" city workers shared with him their suspicion that scrap-metal proceeds were being misused; although they were unable to provide specific information. Mr. Mikula discovered a Padnos check payable to plaintiff in the Department of Public Works safe. He then made City Treasurer Bradford aware of his discovery. (Miller Report at 5, ECF No. 43-2, PageID.382).

Mr. Bradford conducted a review of city records, and he obtained records from Padnos. He later provided the documents and information he obtained to Detective Miller. (*Id.*). Detective Miller interviewed Mr. Bradford on April 2, 2013. Mr. Bradford reviewed the documents and information he had provided. He advised the detective that no city employee had been authorized to use city funds for personal use, and that he had previously told plaintiff that scrap-metal proceeds were to be deposited in the city's bank account. (*Id.* at 8, PageID.385). Plaintiff has not challenged the accuracy of the documents and information Mr. Bradford provided Detective Miller. To the contrary, plaintiff has confirmed Mr. Bradford's statement concerning his instruction regarding the handling of the scrap metal proceeds. (*See* Garber Dep. at 74-75, ECF No. 47-2, PageID.928).

Detective Miller interviewed Mr. Mikula on April 3, 2013. Mr. Mikula largely repeated information he had already provided, as note above. The most controversial

statement Mr. Mikula made concerned his belief that plaintiff "ruled his department with fear and intimidation," which in his opinion could have impeded the detective from getting candid statements from the employees. (Miller Report at 10, PageID.387). Mr. Mikula also suggested that "some of the other employees may have been benefitting personally from the City scrap metal sales." (*Id.*).

Messieurs Mikula and Bradford each testified during the May 7, 2014, preliminary hearing, which resulted in District Judge Brunner's finding of probable cause. (Prelim. Tr. at 5-18, 19-61; ECF No. 47-4; PageID.1009-66). Plaintiff has not challenged the veracity of their testimony.

Plaintiff can cite to no evidence that, during their interviews with Detective Miller or their testimony before Judge Brunner, either Mr. Bradford or Mr. Mikula engaged in conduct that was malicious, corrupt or outrageous. To be sure, there is no evidence that either defendant made any false statement at all. Plaintiff's claims appear to be predicated on his belief that the defendants, including Mr. Bradford and Mr. Mikula, promoted the investigation and his prosecution for embezzlement, without probable cause, to cause him harm – the loss of his election to the city council.

Plaintiff's intentional tort claims necessarily depend, then, on a finding that defendants knew there was no probable cause to charge plaintiff with embezzlement, or at least that they should have known it. But District Judge Brunner, a fair and impartial jurist, found that there was probable cause to charge plaintiff with that crime. It was reasonable, then, for defendants Bradford and Mikula to have believed there was probable cause. The Michigan Supreme Court noted with approval a

Michigan Court of Appeals decision that a "police officer is entitled to immunity when he is 'acting in good faith with probable cause . . . even though the arrest is subsequently found to be baseless.'" *Odom v. Wayne Cty.*, 482 Mich. at 474 (quoting *Blackman v. Cooper*, 89 Mich. App. 639, 643 (1979)). There is certainly no basis to hold city officials to a higher standard than a police officer, who receives substantial training relating to the standards for probable cause.

Given the undisputed facts concerning Mr. Bradford and Mr. Mikula's limited role in the investigation and prosecution of plaintiff, and in light of the Michigan Supreme Court's *Odom* opinion, the defendants have met their burden of establishing their entitlement to qualified immunity. Plaintiff has failed to present evidence sufficient to raise a triable issue of fact concerning that question. Accordingly, defendants are entitled to entry of judgment in their favor on all plaintiff's state law tort claims.

## Conclusion

For the reasons stated herein the defendants' motions for summary judgment (ECF No. 42, 46) will be granted. Plaintiff's motion to amend the complaint (ECF No. 35) will be denied. A judgment consistent with this Opinion will enter.

Date: March 27, 2018
/s/Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge